1  Barbara Enloe Hadsell, Esq. [S.B. #086021]
   Dan Stormer, Esq. [S.B. #101967]
2  Mohammad Tajsar, Esq. [S.B. #280152]
   Brian David Olney, Esq. [S.B. #298089]
3  HADSELL STORMER & RENICK LLP
   128 N. Fair Oaks Avenue
4  Pasadena, California 91103
   Telephone:  (626) 585-9600
5  Facsimile:  (626) 577-7079

6  Joshua Piovia-Scott, Esq. [S.B. #222364]
   HADSELL STORMER & RENICK LLP
7  4300 Horton Street, #15
   Emeryville, CA 94608
8  Telephone: (415) 685-3591
   Facsimile:  (626) 577-7079

9

10 Attorneys for Plaintiffs
   ESTATE OF FERAS MORAD, et al.

11

12              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
13

| | |
|---|---|
| ESTATE OF FERAS MORAD, AMAL ALKABRA, and AMR MORAD, | Case No.: |
| Plaintiffs, | **COMPLAINT FOR DAMAGES** |
| v. | |
| CITY OF LONG BEACH, MATTHEW HERNANDEZ, ROBERT LUNA, and DOES 1–20, inclusive, | 1.   42 U.S.C. § 1983 – Excessive Force |
| Defendants. | 2.   42 U.S.C. § 1983 – Failure to Provide Medical Care |
| | 3.   42 U.S.C. § 1983 – Deprivation of the Rights of Plaintiffs to Familial Relationship with Decedent |
| | **DEMAND FOR JURY TRIAL** |

_____
COMPLAINT FOR DAMAGES

## I. INTRODUCTION

1. The promising life of a talented young student, Feras Morad, ended on May 27, 2015, when Long Beach Police Department Officer Matthew Hernandez shot and killed Morad. At the time Hernandez first contacted him, Morad was unarmed, seriously injured, and in urgent need of medical assistance. Rather than respond with the medical care he needed, or the compassion owed to a wounded and disoriented young man, Hernandez fatally shot Morad five times, twice in the chest, from point blank range. Hernandez killed Morad even though neither Hernandez, the firefighters and paramedics on the scene, nor anyone else was in danger, and even though clear alternatives were present to avoid the use of lethal force. Hernandez's actions, and those of Defendant City of Long Beach, have devastated Morad's family and left an entire community questioning the actions of a department whose cavalier attitude toward officer-involved shootings has become a troubling pattern.

## II. PARTIES

2. Plaintiff Amr Morad is the father of Feras Morad and is a resident of the County of Los Angeles.

3. Plaintiff Amal Alkabra is the mother of Feras Morad and is a resident of the County of Los Angeles.

4. On or about December 10, 2015, the Probate Court appointed Plaintiffs Amr Morad and Amal Alkabra as Special Administrators of the Estate of Feras Morad.

5. Defendant City of Long Beach ("the City") was and is a legal political entity established under the laws of the State of California, with all the powers specified and necessarily implied by the Constitution and laws of the State of California and exercised by a duly elected City Council and/or their agents and officers. The City is responsible for the actions, inactions, policies, procedures, practices, and customs of the Long Beach Police Department ("LBPD") and its agents and employees. At all relevant times, the City was and continues to be responsible for assuring that the actions of the LBPD and its agents and employees comply with the Constitutions of the State of California and of the

United States and any other applicable laws and regulations.

6. Defendant Robert G. Luna is the duly appointed Chief of Police for the LBPD, and an employee of the City. Defendant Luna holds the highest position in the LBPD and is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all LBPD employees and agents. He also is and was responsible for the promulgation of the policies, procedures, and customs pursuant to which the acts and failures to act alleged herein were committed. Defendant Luna is sued individually as well as in his official capacity for the purpose of ensuring that Plaintiffs may obtain complete and effective injunctive relief as against the LBPD, whose actions and conduct are under the control and authority of the current Police Chief.

7. Defendant Matthew Hernandez is an employee of the LBPD who, on information and belief, responded to, detained, and without justification injured and fatally shot Feras Morad.

8. Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendants and each of them were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

9. Plaintiffs are informed and believe, and thereupon allege, that at all times material herein, each of the Defendants was the agent or employee of, and/or working in concert with, his/her co-Defendants and was acting within the course and scope of such agency, employment and/or concerted activity. Plaintiffs allege that to the extent certain acts and omissions were perpetrated by certain Defendants, the remaining Defendant or Defendants confirmed and ratified said acts and omissions.

10. Plaintiffs are informed and believe and thereupon allege, that at all times material herein, each Defendant was dominated and controlled by his/her co-Defendant and each was the alter ego of the other.

11. Whenever and wherever reference is made in this complaint to any act or

failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly and severally.

### III. FACTUAL ALLEGATIONS

**A. Feras Morad's life and academic achievements**

12. At the time of his death, Feras Morad was a 20-year-old student and resident of Woodland Hills in Los Angeles, California. He grew up in Woodland Hills with his family and was close to his mother, father and younger sister.

13. Ever since he was a young boy, Morad was an exceptionally talented and bright student. Beginning in elementary school, Morad was invited to take honors and gifted classes in school. Since that very young age, Morad excelled at every stage of his academic career.

14. Morad attended El Camino Real Charter High School in Woodland Hills, and graduated with a 3.9 grade point average. He was a stellar student in high school and was, by all accounts, exceptionally well liked by his peers.

15. While in high school, Morad's passion was speech and debate. He joined the school's renowned speech and debate team, and was a champion debater earning accolades in local, regional, and national debate competitions. Before his graduation in 2013, he became the second student ever in the school's history to qualify for the National Speech and Debate Championship Tournament, the premier middle and high school speech and debate competition in the nation. At the tournament, Morad tied for 14th place nationally.

16. In addition to his debate work, Morad was also a member of the Navy's Reserve Officers' Training Corps during all four years of high school. Morad won numerous awards from the ROTC leadership for his dedicated service, include a Cadet of the Month award and a Cadet Aptitude Award.

17. Among his many other honors were a nomination to attend the Boys State summer leadership and citizenship programs sponsored by the American Legion, as well

COMPLAINT FOR DAMAGES -3-

as awards from the Ronald Reagan Presidential Foundation in recognition for his civic engagement and achievements in speech and debate.

18. Following his high school graduation, Morad attended Moorpark College in Ventura County, California. Morad once again excelled academically at Moorpark. In addition, Morad continued to participate in college-level speech and debate programs, and competed in regional and national competitions for his Moorpark College speech and debate team. Among his many achievements were earning gold honors at the 2015 parliamentary debate of the Phi Rho Pi National Forensic Organization, a national forensics association for junior and community college teams. Morad also placed second in a national debate competition just one week before his death.

19. During this time, Morad also returned to his high school alma mater to become a coach of its debate team.

20. In total, Morad won more than 50 different academic and debate awards.

21. Following completion of two years of study at Moorpark, Morad applied to transfer to a four-year university. Owing to his strong academic credentials and extracurricular achievements, Morad was accepted into numerous top universities, including UCLA, UC Berkeley, and UC Irvine.

22. At the same time, California State University Long Beach ("CSULB") heavily recruited Morad to enroll in the university and join their top-ranked forensics and debate team. After considering their debate team and the university's offer of a full scholarship, Morad decided to attend CSULB. He was scheduled to begin his studies in Fall 2015, around the time of his death. Morad planned on eventually studying at Harvard Law School and becoming a criminal defense attorney.

23. Morad had no criminal record, and he is not known to have had any run-ins with law enforcement.

**B.  Defendants' killing of Morad**

24. On May 27, 2015, Morad and a number of friends and debate team colleagues were studying at an apartment in the Circle area neighborhood of Long Beach,

COMPLAINT FOR DAMAGES            -4-

1  California, near the campus of CSULB. The apartment unit was on the second floor of the
2  building. The Circle area is a safe, quiet, family-oriented neighborhood that houses many
3  families and college students, and is not known to be a dangerous crime-ridden or violent
4  neighborhood.

5  25.  Upon information and belief, the group ended their afternoon of studying and
6  began to socialize together at the apartment. At approximately 7 p.m., Morad fell through
7  a window of the second-floor apartment and landed in the adjoining alley on the 4600
8  block of East 15th Street. The fall left him severely bloody with a gash on his arm and
9  potential head injuries. The entire incident which culminated in Morad's death occurred
10 during daylight hours.

11 26.  After his fall, one of the apartment unit's neighbors called 911 to ask for
12 medical assistance for Morad. The neighbors and friends who asked for the call to be
13 made were seeking medical attention for Morad. The caller reported that one of their
14 neighbors "fell out of a window", "might be intoxicated," and is "bloody." The radio
15 dispatcher informed the neighbor that they were "going to send the paramedics," and later
16 added that they would send the police as well.

17 27.  A second dispatch call between Fire and Police Department dispatchers,
18 made presumably after the initial 911 call, likewise stated that Morad had fallen out of
19 second-story window and that he did not have any weapons.

20 28.  Defendant Hernandez arrived solo in his squad car in the alley behind the
21 apartment building to find Morad in a dazed, confused condition. Morad was bleeding
22 profusely from a gash on his arm. He was covered in blood, including on his arm, neck
23 and chest and was staggering around without a shirt or shoes, wearing only jeans. Morad
24 was unarmed and did not have anything in his hands.

25 29.  Hernandez's police car pulled up to near where Morad had fallen. Upon
26 exiting his patrol car, Hernandez was located in the middle of the alley and had plenty of
27 room to retreat down the alley or move behind his patrol car to create space between
28 himself and Morad should he have needed to.

30. If Hernandez had considered Morad to be a threat or danger, Hernandez could have called for backup and waited for it to arrive, as a police station was located approximately a mile away. However, Hernandez failed to do so and instead, contrary to established police practices, began his contact with Morad alone. Hernandez commenced yelling and shouting commands at a clearly disoriented and obviously seriously injured Morad. Morad did not appear to understand Hernandez's commands and was unable to respond to them. Rather, Morad appeared clearly dazed, confused and disoriented. He walked around in circles, aimlessly, stumbling and staggering in the area around the parked police car, in an almost zombie-like state. Morad did not have a weapon or anything in his hands or on his person at any time that appeared to be a weapon. Nor at any point in time during the incident did Morad say anything about having a weapon or attacking Hernandez or anyone else.

31. Almost simultaneously as Defendant Hernandez arrived at the scene, City paramedics and firefighters arrived. Upon arrival in the alley shortly after Hernandez, these several firefighters and/or paramedics stood by and watched the entire scene within sight of Hernandez. At no point in time during the entire incident did Hernandez communicate with them so as to coordinate efforts, allow them to render aid to the obviously injured Morad, or to enlist their support in controlling Morad.

32. Moreover, numerous onlookers at the scene repeatedly called out to Hernandez that Morad was seriously injured, unarmed and needed help. Hernandez ignored all of these entreaties and instead aggressively attempted to deal with the situation on his own. Contrary to established practices, Hernandez began to effectuate a seizure and arrest of Morad, alone, rather than to ask or wait for assistance from the firefighters or back up police. Nor did Hernandez do anything to allow the firefighters and/or paramedics on scene to tend to Morad's need for immediately medical care.

33. At various times, Morad raised his arms and hands in the air, away from his body, leaned against the patrol vehicle, appearing to have difficulty standing and walking, or attempted to get on the ground as commanded. However, injured, dazed and confused

and not able to comprehend what Hernandez was commanding, Morad got up again.

34. Hernandez ineffectively attempted to taze Morad and handcuff Morad and grew frustrated when these efforts failed. After these failed attempts to gain control of Morad, Hernandez drew his firearm.

35. Unable to gain compliance of an obviously injured, confused and disoriented Morad, and despite Morad's clear need of medical attention, Hernandez made the fatal and rash decision to use deadly force. In doing so, Hernandez ignored other far less devastating alternatives—like waiting for additional support he knew was arriving from a nearby LBPD police station, or communicating and coordinating with the paramedics and firefighters who had been called to assist Morad and were on scene within sight of Hernandez for nearly the entire incident, including asking for their assistance in controlling Morad or in treating him. Instead, Hernandez shot Morad five times at point blank range, including twice in the chest.

36. At no point in time during the entire incident, including when he fatally shot Morad, was Hernandez backed up against a wall, pinned against his patrol car or in any way boxed in. To the contrary, Hernandez had plenty of space in the alley to safely maneuver away from Morad. For example, he could have easily walked away, or positioned himself behind the patrol car to put a buffer between him and Morad.

37. At no point in time from the moment Hernandez aggressively confronted the seriously injured Morad until he fatally shot him, did Morad run toward Hernandez, move aggressively or quickly toward him, threaten or act violently toward him, or attack or threaten to attack or fight with him in any way. Feras never formed or raised fists at Hernandez, threw a punch at Hernandez, attempted to grab, strike or otherwise assault or injure him in any way whatsoever.

38. At no point in time from the moment Hernandez aggressively confronted the seriously injured Morad until he fatally shot him, did Morad say or do anything which could reasonably have led someone to fear Morad or believe Morad was going to hurt or be a danger to Hernandez or to anyone else.

COMPLAINT FOR DAMAGES -7-

39. At no point from the moment Hernandez aggressively confronted the seriously injured Morad until he fatally shot him, did Morad pose a danger to Hernandez, the firefighters and paramedics on scene, or to any of the onlooking members of the public.

40. To the contrary, when Hernandez drew his weapon members of the public yelled out "Don't shoot" and "He's not armed."

41. After shooting Morad, Hernandez turned his body over onto his stomach and put handcuffs on him. Almost immediately following Hernandez's shooting of Morad, many other police officers arrived on the scene, and the firefighters and paramedics who watched the encounter rushed to render medical aid for the first time. Morad died as a result of the shots fired by Hernandez.

**C.   Defendants' practice of reliance on deadly force**

42. Sadly, Hernandez's actions are consistent with Defendant City of Long Beach's policy and practice of using excessive force and confrontation to intercede with individuals who are mentally distressed or in need of medical care, as Feras Morad was. The City has failed to appropriately train and guide its police officers on how to appropriately approach, assess and interact with compromised individuals like Morad, to deescalate crisis situations, and to seek immediate medical and mental health care for them. As a result, officers like Hernandez unnecessarily rely on deadly force.

43. On information and belief, these failures in policy and training are further exacerbated by cavalier personnel decisions that infect LBPD, including the selection, retention, and assignment of officers with demonstrable propensities for excessive force, violence, and misconduct, as well as the condoning and encouraging of officers like Hernandez who effectuate such violations without impunity and without any adverse impact on their employment status or benefits. According to press reports, the City placed Hernandez on paid administrative leave rather than holding him accountable for his unjustified shooting of Morad.

44. For these reasons, Defendant City of Long Beach has been responsible for

COMPLAINT FOR DAMAGES     -8-

numerous prior incidents of officer-involved shootings that have resulted in community outcry and calls for reform. These incidents occurred as recently as April 23, 2015, when LBPD officers killed 19-year-old Hector Morejon, the family of whom has recently instituted a lawsuit against the City arising out of his death.

45. Another recent case involved the death of Jason Conoscenti also at the hands of LBPD in April 2014. Conoscenti's death was captured on video, which showed officers opening fire at him as he ran away down a staircase with a police dog chasing him. LBPD issued a statement following the shooting claiming officers had observed him reaching for his waistband, which was contradicted by the video.

46. In August 2016, Defendant City of Long Beach approved settlements to the families of both Conoscenti and Morejon totaling $3.5 million following the filing of wrongful death lawsuits. These two settlements follow a well-established pattern within the City of officer-involved shootings characterized by police misconduct. According to a 2013 report by the OC Register, the City paid $18.8 million in damages for between 2008 and 2013 for police misconduct, spending a significant percentage of its self-insurance fund annually to pay for what the report's authors characterized as "police mistakes."

### D.   Defendants' failure to notify Plaintiffs of Morad's death

47. Compounding the litany of errors in Hernandez's response to the emergency call regarding Morad, Defendants failed to communicate at all with Plaintiffs concerning the death of Morad. Defendants did not notify Plaintiff or any other members of Plaintiffs' family of Morad's death. Plaintiffs learned of Morad's death two days afterward via a Facebook message received by Morad's sister from a friend of Morad. The only communication received by Plaintiffs from the City was its rejection of Plaintiffs' tort claims in anticipation of this suit's filing.

48. After the family was informed and after witnesses began reporting the incident, news of Morad's death soon circulated quickly among his various circles of friends and loved ones. Not long after, his friends and family organized vigils and protests to commemorate his life and to demand justice and accountability for his death. Tributes

COMPLAINT FOR DAMAGES         -9-

and comments poured in to a Facebook page set up by Morad's friends in his honor, which within a matter of days had nearly 8,000 followers.

**E.     Plaintiffs have suffered serious injuries as a result of Defendants' actions**

49.    Since his death, Plaintiffs Amr Morad and Amal Alkabra have suffered devastating and continuous mental and emotional injuries. Both parents were close to Feras, loved him dearly, and fully expected to live a long and happy life with him. Since his death, they have lived a nightmare. They suffer from serious depression and anxiety, and have been forced to take lengthy time off of work and seek significant medical attention.

50.    In addition to their current mental and emotional injuries, Plaintiffs Amr Morad and Amal Alkabra have and will continue to suffer injuries owing to the loss of their son into the future, including the loss of his caring familial relationship and the loss of significant future economic support.  Plaintiff Estate of Feras Morad has also suffered significant economic injuries as a result of Defendants extinguishing what promised to be a successful professional career.

51.    After his death, Morad has been honored by many members of the speech and debate community in Southern California. For instance, San Diego State University in conjunction with Point Loma University commissioned an award in Morad's honor to be given at a debate and forensics competition hosted at San Diego State. According to the Point Loma University website, the Feras Morad Award was inaugurated in 2015 "to honor not only competitive excellence, but also citizenship and leadership attributes." Morad's name was also added to a debate award given by Moorpark College, renaming the Pilot Award to the Pilot Morad Award.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983**

**(Fourth and Fourteenth Amendments: Excessive Force)**

**(By Plaintiff Estate of Feras Morad Against All Defendants)**

81.    Plaintiff Estate of Feras Morad realleges and incorporates by reference each

---

COMPLAINT FOR DAMAGES            -10-

and every allegation contained above as though fully set forth herein.

82. On or about May 27, 2015, after the causes of action arose in his favor, Decedent Morad would have been a Plaintiff in this action had he survived the injuries he sustained.

83. All of the acts of Defendants and the persons involved were done under color of state law.

84. The acts of Defendants deprived Feras Morad of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force, including lethal force. Officer Hernandez unreasonably and repeatedly shot Mr. Morad five times at point blank range without justification, resulting in his death.

85. As a direct and proximate result of the aforementioned acts of Defendants, Mr. Morad sustained and incurred damages for a measurable period of time before his death, including pain and suffering, emotional injury, and a loss of the enjoyment of life and other hedonic damages as he lay in pain, dying.

86. In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for the constitutional rights of Feras Morad. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved a lone officer killing an unarmed, wounded individual and failing to seek assistance or backup from other officers or paramedics—as well as the repeated instances of police misconduct which have plagued the City in recent years. Punitive damages are therefore justified.

87. The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Long Beach. These include

policies and longstanding practices or customs on the use of force, including lethal force, in situations including but not limited to engaging in confrontation to intercede with individuals who are mentally distressed or in need of medical care.

88. In addition, the training policies of the City of Long Beach were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals who are mentally distressed or in need of medical care. The City of Long Beach knew that its failure to adequately train its officers to interact with individuals who are mentally distressed or in need of medical care made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Morad of their rights. The City of Long Beach was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

89. Defendant City of Long Beach's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Feras Morad by the individual Defendants; that is, the City of Long Beach's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Morad's rights as to be the moving force that caused his injuries.

90. LBPD Chief Robert Luna, a final policymaker for the City of Long Beach, ratified the actions and omissions of Officer Hernandez in that he had knowledge of and made a deliberate choice to approve Hernandez's unlawful acts and omissions.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
**(Fourth and Fourteenth Amendments – Failure to Provide Medical Care)**
**(By Estate of Feras Morad Against All Defendants)**

91. Plaintiff Estate of Feras Morad realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

92. On or about May 27, 2015, after the causes of action arose in his favor, Decedent Morad would have been a Plaintiff in this action had he survived the injuries he

sustained.

93. All of the acts of Defendants and the persons involved were done under color of state law.

94. The acts of Defendants deprived Feras Morad of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, denying him medical care in between the time of Morad's seizure and his unlawful killing. When Hernandez seized Morad, Morad was in obvious need of medical care. Morad was bleeding profusely, was covered in blood, and was severely disoriented confused. Hernandez did not summon medical care, however. In fact, he prevented firefighters and/or paramedics present on the scene from providing care to Morad. Hernandez did not communicate with the firefighters and/or paramedics, enlist their assistance, or permit them to render aid. Instead, initiated an unnecessary interaction with Morad and proceeded to shoot him five times at point blank range, killing him.

95. As a direct and proximate result of the aforementioned acts of Defendants, Mr. Morad sustained and incurred damages for a measurable period of time before his death, including pain and suffering, emotional injury, and a loss of the enjoyment of life and other hedonic damages.

96. In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for the constitutional rights of Feras Morad. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against the individual Defendants (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved a lone officer killing an unarmed, wounded individual and failing to seek assistance or backup from other officers or paramedics—as well as the repeated instances of police misconduct which have plagued the City in recent years. That Defendants failed to provide or allow

for the treatment of Morad even in the presence of the City's own paramedics makes the death of Morad even more troubling, and demonstrates willful disregard for Plaintiffs' constitutional rights and maliciousness in their treatment of Morad. Punitive damages are therefore justified.

97. The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Long Beach. These include policies and longstanding practices or customs on decisions whether to render medical aid or permit other trained professionals to render such aide, and the use of force, including lethal force, in situations including but not limited to engaging in confrontation to intercede with individuals who are mentally distressed or in need of medical care.

98. In addition, the training policies of the City of Long Beach were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals who are mentally distressed or in need of medical care. The City of Long Beach knew that its failure to adequately train its officers to interact with individuals who are mentally distressed or in need of medical care made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Morad of their rights. The City of Long Beach was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

99. Defendant City of Long Beach's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Feras Morad by the individual Defendants; that is, the City of Long Beach's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Morad's rights as to be the moving force that caused his injuries.

100. LBPD Chief Robert Luna, a final policymaker for the City of Long Beach, ratified the actions and omissions of Officer Hernandez in that he had knowledge of and made a deliberate choice to approve Hernandez's unlawful acts and omissions.

///

COMPLAINT FOR DAMAGES     -14-

# THIRD CAUSE OF ACTION

## 42 U.S.C. § 1983

### (Fourteenth Amendment – Denial of Substantive Due Process Right to Familial Relationship)

### (By Plaintiffs Amal Alkabra and Amr Morad Against All Defendants)

101.  Plaintiffs reallege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

102.  All of the acts of Defendants and the persons involved were done under color of state law.

103.  The acts and omissions of the individual Defendants deprived Amal Alkabra and Amr Morad of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to their rights under the Fourteenth Amendment of the United States Constitution by, among other things, depriving Plaintiffs of their right to a familial relationship with their son without due process of law by their use of unreasonable, unjustified lethal force. Defendants' use of lethal force shocks the conscience.

104.  As a direct and proximate result of the foregoing wrongful acts, Defendants, and each of them, Plaintiffs sustained general damages, including grief, emotional distress and pain and suffering, loss of comfort and society, and special damages, including loss of support, in an amount in accordance with proof.

105.  In doing the foregoing wrongful acts and omissions, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Plaintiffs Amal Alkabra and Amr Morad and the Decedent. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct. This is in part due to the particularly troubling circumstances of this case—which involved a lone officer killing an unarmed, wounded individual and failing to seek assistance or backup from other officers

or paramedics—as well as the repeated instances of police misconduct which have plagued the City in recent years. Punitive damages are therefore justified.

106. The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of the City of Long Beach. These include policies and longstanding practices or customs on the use of force, including lethal force, in situations including but not limited to engaging in confrontation to intercede with individuals who are mentally distressed or in need of medical care.

107. In addition, the training policies of the City of Long Beach were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals who are mentally distressed or in need of medical care. The City of Long Beach knew that its failure to adequately train its officers to interact with individuals who are mentally distressed or in need of medical care made it highly predictable that its officers would engage in conduct that would deprive persons such as Decedent, and thus Plaintiffs Amal Alkabra and Amr Morad, of their rights. The City of Long Beach was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

108. Defendant City of Long Beach's official policies and/or longstanding practices or customs, including but not limited to its training policies, caused the deprivation of the constitutional rights of Plaintiffs Amal Alkabra and Amr Morad and Decedent by the individual Defendants; that is, the City of Long Beach's official policies and/or longstanding practices or customs are so closely related to Decedent's death and thus the deprivation of the rights of Plaintiffs Amal Alkabra and Amr Morad as to be the moving force that caused his injuries.

109. LBPD Chief Robert Luna, a final policymaker for the City of Long Beach, ratified the actions and omissions of Officer Hernandez in that he had knowledge of and made a deliberate choice to approve Hernandez's unlawful acts and omissions.

///

///

COMPLAINT FOR DAMAGES    -16-

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. For compensatory, general and special damages against each Defendant, jointly and severally, amounts to be proven at trial;

2. Punitive and exemplary damages against individually named Defendants Hernandez, and Luna in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

3. Prejudgment interest;

4. For costs of suit and reasonable attorneys' fees and costs as authorized by statute or law;

5. For restitution as the Court deems just and proper;

6. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury in this action.

Dated: September 9, 2016         Respectfully Submitted,

HADSELL STORMER & RENICK LLP


By:  /s/ Mohammad Tajsar
     Barbara Enloe Hadsell
     Dan Stormer
     Joshua Piovia-Scott
     Mohammad Tajsar
Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES        -17-